**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

| | |
|---|---|
| PAUL TIMOTHY RHODES, and ) | |
| RAYCHEL PAULETTE CROWDER RHODES, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | No. 2:10-cv-02068-JPM-dkv |
| ) | |
| LAUDERDALE COUNTY, TENNESSEE, and ) | |
| STEVE SANDERS, in his official ) | |
| capacity as Sheriff of ) | |
| Lauderdale County, ) | |
| ) | |
|     Defendants. ) | |

---

**MEMORANDUM OPINION AND ORDER FOLLOWING NON-JURY TRIAL**

---

Plaintiffs Paul Timothy Rhodes and Raychel Paulette Crowder
Rhodes ("Plaintiffs" or "the Rhodeses") bring this action
against Lauderdale County and Sheriff Steve Sanders ("Sheriff
Sanders") in his official capacity as Sheriff of Lauderdale
County ("Defendants").[1]  (Docket Entry ("D.E.") 1.)  Because
Defendants stipulated to liability in this matter (see D.E. 25),
the Court held a bench trial in this case on June 5, 2012,
solely to determine the amount of damages due to the Plaintiffs.
For the reasons that follow, the Court grants Plaintiffs
$229,500.00 in damages.

---

[1] Plaintiffs amended their complaint on February 18, 2010.  (D.E. 9.)

## I.    Factual and Procedural Background

Plaintiffs' complaint alleged that Sheriff Sanders had implemented a policy of detaining individuals without probable cause, in violation of the Fourth Amendment to the United States Constitution.  The policy in question specifically authorized law enforcement officials to detain individuals in the Lauderdale County Jail for up to forty-eight hours, for the purpose of conducting further investigation, without probable cause to believe that the individuals being detained had committed an offense.  The Rhodeses alleged that they had been illegally detained in the Lauderdale County jail for thirty-six hours.  They sought damages and injunctive relief under 42 U.S.C. § 1983, and also sought to certify a class comprising "all persons who are presently or in the future presented by any law enforcement for detention in the Lauderdale County Jail." (D.E. 9.)

On July 2, 2010, the Court entered a Consent Order Certifying Class Action and Granting Preliminary Injunctive Relief (D.E. 18.)  The Court's Order certified a class under Federal Rule of Civil Procedure 23(b)(2) to include:

> For the time period from the date of entry of this order going forward, any person presented by any law enforcement officer for detention in the Lauderdale County Jail, when such person at the time of presentment does not have pending criminal charges or judicial process justifying detention.

(D.E. 18 at 3.) The Court also entered a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), consented to by all parties, which stated as follows:

> Defendant Steve Sanders in his official capacity as Lauderdale County Sheriff is by consent preliminarily enjoined from detaining any class member in the Lauderdale County Jail, absent at the time detention of a class member is initiated, law enforcement having probable cause to believe the class member committed a criminal offense or was in the process of committing an offense.
> The purpose of this preliminary injunction is to preclude detention of a class member for investigative purposes, without law enforcement having probable cause to believe the class member committed a criminal offense at the time detention of the class member in the Lauderdale County Jail is initiated. Nothing in this preliminary injunction precludes detention of class members held pursuant to lawful judicial process such as warrants, attachments, mittimus and other court orders.

(D.E. 18 at 3.)

Plaintiffs moved for partial summary judgment on August 9, 2010. (D.E. 19.) Plaintiffs asserted that no genuine issue of material fact existed as to Lauderdale County's liability under 42 U.S.C. § 1983. (Id.) Defendants' response stipulated to liability in the matter. (D.E. 25.) Defendants admitted that the Rhodeses were detained without probable cause because, due to an erroneous reading of County of Riverside v. McLaughlin, 500 U.S. 44 (1991), Lauderdale County law enforcement officials believed that they had forty-eight hours to establish probable cause and file charges against suspects. (Id.) The Court

granted summary judgment on November 12, 2010, holding that
Defendants were liable under 42 U.S.C. § 1983 to Plaintiffs,
both individually and as a class, for violating their rights
under the Fourth Amendment.  (D.E. 27.)

On April 23, 2012, the parties filed a Joint Motion for
Approval of Settlement of Declaratory and Injunctive Relief
Claims in Class Action Suit.  (D.E. 65.)  The settlement
proposed by the parties provided the same relief as the
preliminary injunction and additionally required the Sheriff to
maintain records of all persons admitted to the Lauderdale
County Jail, including the reason for each person's admission.
The settlement also imposed upon the Sheriff an affirmative
obligation to notify Plaintiffs' counsel within seventy-two
hours of any known violation of the Order.

Under the terms of the settlement, Defendants have an
opportunity to move to terminate the injunction five years after
entry of the final judgment with consent of Plaintiffs' counsel
provided that no contempt proceedings are filed or pending
during that time period.  The Court approved the settlement on
April 30, 2012.  (D.E. 70.)

The Court held a non-jury trial on June 5, 2012, to
determine the final contested issue — the amount of damages due
to the Rhodeses.  (D.E. 84.)  Plaintiffs were represented by
Robert Hutton, esq.  Defendants were represented by Brandon

Gibson, esq.   Plaintiffs' proof at the hearing consisted of the testimony of Dr. John Ciocca, Raychel Paulette Crowder Rhodes, and Paul Timothy Rhodes and exhibits.  Defendants' proof consisted of the testimony of Sheriff Sanders.

## II.  Findings of Fact

### A.  Stipulated Facts

Many of the material facts are undisputed.  Below are the stipulated facts from the Joint Pretrial Order:

1.   Raychel and Paul Rhodes were taken from their home into custody in the Lauderdale County Jail on Sunday, January 17, 2010 at approximately 11:23 p.m.

2.   The Rhodeses mug shots were taken, their clothing and property were confiscated, and they were issued jail clothing, a sheet, a mattress, and a washcloth.

3.   Raychel Rhodes was housed alone in the booking area in Unit 10, which is a small cell with a concrete bunk, a concrete floor, and a stainless steel toilet.

4.   Paul Rhodes was housed alone in a court holding cell.   Paul Rhodes' cell had a concrete bench, concrete floor and a stainless steel toilet.

5.   Ultimately both Raychel and Paul Rhodes were released from the Lauderdale County Jail on Tuesday, January 19, 2010 at approximately 11:45 a.m., after they were each held over 36 hours.

### B. Testimony and Evidence Introduced During Trial

#### 1. Dr. John Ciocca, MD

Dr. John Victor Ciocca, MD ("Dr. Ciocca") testified to the following facts.  Dr. Ciocca has worked as a licensed clinical

psychologist in the State of Tennessee since 1982. He currently practices as the Director of the Exeter Psychotherapy Group located at 2014 Exeter Road in Germantown, Tennessee. Dr. Ciocca obtained a Bachelor of Arts degree in psychology from Wilkes College in Wilkes-Barre, Pennsylvania in 1976, a Master of Science degree in Clinical Psychology from Hahnemann Medical College and Hospital in Philadelphia, Pennsylvania in 1978, and a Doctor of Psychology degree from Hahnemann Medical College and Hospital in 1981. (See Ex. 1.) Approximately half of Dr. Ciocca's current practice is comprised of court evaluations, and he has testified in federal courts in Memphis, Tennessee, Jackson, Tennessee, and Oxford, Mississippi. Upon no objection from the Defendants, the Court admitted Dr. Ciocca as an expert competent to testify regarding the state of mind of both Raychel and Paul Rhodes.

Dr. Ciocca testified that he was retained in early 2010 to conduct a forensic evaluation of the Rhodeses. He met with Raychel Rhodes on three occasions to evaluate her: February 4, 2010, February 22, 2010, and June 4, 2010. He spent a total of five hours with her, during which time he administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) test and the Millon Clinical Multiaxial Inventory-III (MCMI-III) test. In addition, he conducted a series of interviews and administered a symptom checklist.

Dr. Ciocca testified that, in his opinion, Raychel Rhodes suffered from acute stress disorder and, by June 4, 2010, was suffering from post-traumatic stress disorder ("PTSD") as a direct result of her incarceration in the Lauderdale County Jail. Dr. Ciocca testified that PTSD, classified as an anxiety disorder in the Diagnostic and Statistical Manual of Mental Disorders, is a particular kind of anxiety disorder that results from exposure to extreme trauma.

In Raychel Rhodes' case, he noted that she experienced a variety of symptoms consistent with PTSD, including anxiety, sleep problems, difficulty concentrating, and persistent attempts to avoid thinking of events and any sightings of people associated with her incarceration. Dr. Ciocca testified that in its most extreme form, PTSD can cause a person to become completely house-bound and limit his or her social or occupational interaction. In its milder form, it can make social and occupational interaction difficult without completely precluding participation in life.

Dr. Ciocca testified that in his opinion, Raychel Rhodes suffered from moderate PTSD during their June 4, 2010, meeting. As to whether the PTSD would be permanent, Dr. Ciocca testified that symptoms must persist for more than three months after an event to permit a diagnosis of PTSD. According to Dr. Ciocca, Raychel Rhodes exhibited symptoms of acute stress disorder

during the February 2010 visit, which were still present in June 2010.  Dr. Ciocca testified that PTSD symptoms typically improve over time, but it is difficult to predict whether a specific patient's symptoms will persist.

Dr. Ciocca testified that, at the June 4, 2010, evaluation, Raychel Rhodes' symptoms included:  difficulty sleeping; nightmares; continued avoidance of situations, people, and locations related to the incarceration; fear that the event would reoccur; anxiety; difficulty concentrating; and a general hypervigilance to stimuli, including overreaction to sirens. Dr. Ciocca testified that, as of his June 4, 2010, examination of Raychel Rhodes, he believed that she suffered from PTSD as a result of the incarceration.  He further testified that the tests he conducted corroborated the interview data.

Dr. Ciocca also evaluated Paul Rhodes and testified that Paul Rhodes did not demonstrate any discernible psychological disorder.

Dr. Ciocca testified that only the most severe forms of trauma trigger post-traumatic stress.  He testified that, for Raychel Rhodes, the detention and the limiting of her freedom was one such trigger.  Dr. Ciocca testified, however, that each person reacts differently to stress.  He stated that what differentiates PTSD from a normal stress response is its severity and its persistence over time.  Dr. Ciocca testified

that Raychel Rhodes worried that her detention would result in losing custody of her child, which further aggravated her condition.

On cross-examination, Dr. Ciocca testified that he was unaware of any medication being prescribed to Raychel Rhodes for her PTSD symptoms. To the best of his knowledge, she only received treatment from her primary-care physician and may have received some medication to help her sleep. She was not, however, receiving any psychiatric or psychological care. He had no opinion as to whether her PTSD was ongoing. He testified that, although his report indicated that Raychel Rhodes demonstrated a "tendency to avoid self-disclosure" with regard to the Millon test, that statement actually indicated that she was underreporting symptoms even though she still showed significant elevations under the test. He was unaware that she had returned to the Lauderdale County Justice Center since June 2010, but he speculated that any voluntary decision to visit the Justice Center was consistent with someone attempting to overcome PTSD symptoms. On redirect, Dr. Ciocca testified that a decision to return to the Justice Center was not inconsistent with having PTSD, but merely an indication of a person's capacity to control their anxiety on a limited basis.

### 2. Raychel Paulette Crowder Rhodes

Raychel Rhodes testified to the following facts. Raychel Rhodes currently lives at 84 Carmack Road in Ripley, Tennessee. She married Paul Rhodes on May 25, 2008. The two have two children: Gracie Childress, who is four years old, and Kristie Hunter, who is twenty years old. Raychel Rhodes went to high school in Ripley, obtained her G.E.D., and currently works as a homemaker.

Raychel Rhodes testified that on January 17, 2010, she, her husband, and their children attended afternoon service at their church, came home, then returned to church for the evening service at 5:30 p.m. Paul Rhodes left before preaching started and drove to the Justice Center to exchange Gracie with her biological father for the Martin Luther King holiday.[2] He returned from the Justice Center and they left the church together at around 7:45 p.m. They arrived home and had dinner with their eldest daughter, Kristie, and her friend. At around 9:00 p.m., Paul Rhodes took Kristie to her friend's home, where she would be spending the night. At that time, Raychel Rhodes went to another room to watch television. Paul Rhodes returned at around 9:25 p.m. and they watched television until 10:00 p.m., at which point she left to go to sleep while he stayed up to continue watching television.

---

[2] Raychel Rhodes testified that, during this time period, she shared custody of Gracie with Gracie's father, Ashley Childress. The custody arrangement required them to meet at the Justice Center to exchange physical custody of Gracie.

Raychel Rhodes testified that she next remembers waking up to the sound of someone saying, "You can go wake her up or we will." She then heard someone telling her husband that they were being held on suspicion of burglary. She immediately got out of bed, walked into the kitchen, and saw her husband sitting in a chair surrounded by three officers. One of the officers asked her to identify herself and, when she told him her name, he stated that she would have to go with them. Raychel Rhodes began asking questions, but the officers told her that she and her husband were being taken into custody for investigation on suspicion of burglary and that they could not disclose any other information. She asked if they had a warrant, but they told her that one was not necessary. She told them that they could not legally take her to the Justice Center, but she testified that she soon resigned herself to the fact that she would be forced to go with them regardless and left the room to get dressed. The officers then followed her husband to another part of the house because he had declared that he kept guns in his closet.

Raychel Rhodes testified that she and Paul Rhodes were driven to the station in separate vehicles. She testified that they left her home at 10:45 p.m. and that she was driven by Office Crowder, who was not disrespectful to her. She testified that she was in a state of shock and recalled asking for a seat belt. Officer Crowder offered to pull over so she could get out

and find the seat belt, but she feared leaving the vehicle because she worried about being shot if she stepped out of the car.

When they arrived at the Justice Center, Raychel Rhodes was separated from Paul Rhodes, only seeing him through a window in the processing area.  She was taken to a desk in the processing area, where she again expressed confusion as to why she had been brought there.  She testified that the officer at the desk told her that they could not disclose anything other than that she and her husband were being held for investigation of burglary. Raychel Rhodes told the officers that she and her husband could not legally be held, but the officer pointed to a sign taped to the wall stating that the Lauderdale County Police Department could hold anyone for forty-eight hours under investigation. Raychel Rhodes then gave one of the offices her driver's license and answered questions about her insurance coverage, health, and dietary restrictions.  She was then asked for her belongings, including her wedding rings, and had her mug shot taken.  She testified that the officer took her shoestrings, jacket, pants, and belt, and that she signed a property receipt for property that was given to her by the Lauderdale County Jail (Ex. 3 and Ex. 4), including a blanket, a mattress, two sheets, a towel, uniform pants, uniform shirt, and a washcloth.

Raychel Rhodes testified that, after receiving these items, she was escorted by another officer, who she identified at trial as "Ms. Gracie," to a room containing tethered canvas mats. Because the mats were in such poor condition, she was issued two mats. She was then led back towards the booking area. Before reaching the booking area, they reached a number of cells and Ms. Gracie asked another officer which cell was assigned to Raychel Rhodes. The officer then opened up a cell that smelled strongly of urine. The officer walked over to the commode and steel toilet in the cell, which would not flush and still contained urine from a previous inmate. The cell was small, built of concrete, contained a small bench, and had a steel door with a small window. Raychel Rhodes testified that the cell was not cleaned before she was placed in it and that it was not cleaned for the duration of her stay. Because she had to urinate and defecate while standing, anyone who walked by her cell could see her use the toilet. The lights in the cell were always on, even though she asked for them to be turned off so that she could sleep. She slept on the floor in the center of the cell because the cell walls appeared to have vomit on them. She was placed in the cell at around midnight and, as soon as the door was locked, she began to feel very anxious and experience a panic attack. During her stay, she only ate a bag of chips and some cereal.

Raychel Rhodes testified that, the next day, she met with Kenneth Richardson ("Richardson") and Clay Newman ("Newman"), investigators at the Sheriff's Department, to discuss her detention. This meeting occurred at around noon. According to Raychel Rhodes, Richardson told her that he could not tell her anything until she signed a form waiving her Miranda rights and her right to call her attorney. She told him that she could not obtain counsel because it was a holiday, and testified that the officers led her to believe that once they verified her version of events, she would be permitted to leave. Upon that belief, she signed the form. Richardson then told her that Anita Tropster's house had been burglarized. He asked for her whereabouts between 6:00 p.m. and 9:00 p.m. on Sunday night, and she told them that she and her husband went to church and that her husband left to drop Gracie off at the Justice Center. She in turn asked Richardson and Newman questions about the break-in because her two-year-old daughter was with Anita Tropster at that time.

Raychel Rhodes testified that she was then taken back to her cell at approximately 1:00 p.m. Richardson and Newman returned to her cell at around 2:30 p.m. to inform her that the pastor of her church had confirmed that she and her husband were at church on Sunday evening. She asked them why they continued to hold her but received no answer. They asked her for

14

permission to go to her home and search her and her husband's vehicles, but she refused. That conversation was the last time she spoke to Richardson and Newman that day. She testified that she told Richardson and Newman that she needed to leave by 6:00 p.m. to exchange her daughter outside the Justice Center and was concerned about missing the exchange and having custody taken away from her. Later that day, at around 4:00 p.m., she tried to ask for the investigators through the flap on her door, but was told that they had left for the day.

The following morning, Raychel heard a commotion in the cell next to hers, so she got down on her hands and knees and was able to capture someone's attention. The person was a young man that she had previously met at a restaurant. She asked him if he could go find Tommy Simpson ("Simpson"), another investigator who she had met the previous Friday.

Sometime later, Simpson visited her cell with Richardson. She told Simpson about her situation and the fact that the other officers would not release her. She told Simpson he was the only one she could trust. Simpson said he had to go to court, but he would return later. The two officers started walking away from the cell, and she heard Richardson laughing. A few moments later, Richardson returned, entered the cell, and stated that he was offended at the fact that she had told Simpson he

was the only one she trusted.  He told her that releasing her
was not his choice.

Later that day, Raychel Rhodes was taken back to the
investigation room with Richardson and Simpson.  She asked for a
pencil and paper and drew a map of the church, the Justice
Center, Anita Tropster's home, and the home where Paul Rhodes
took their eldest daughter to show the investigators that it
would have been impossible for them to commit the burglary.
Richardson refused to question her, but Simpson agreed with her.

Raychel Rhodes then returned to her cell.  A few hours
later, someone came and told her that she could leave.
According to the jail records, she was released at around
11:45 a.m.  Officer Simpson drove Raychel and Paul Rhodes home
in an unmarked vehicle.

Raychel Rhodes testified that, after her incarceration, she
became a fearful person and lost respect for the law.  She
started having nightmares, which have become less frequent.  She
now keeps her doors locked.  She fears law enforcement and feels
like they are waiting for an opportunity to incarcerate her
again.

She testified that she felt humiliated when the officers
came into her home, disregarded the law, and rendered her
defenseless against their intrusion.  She also testified that
speaking out of the flap on the door was a humiliating

experience.  She testified to being concerned about how her reputation in the community would suffer as a result of this incident.  Her primary concern was that her daughter's father would use this incident against her.  She was also concerned about her daughter and the kind of ridicule her daughter would experience.

Raychel Rhodes testified that, since her incarceration, she has tried to avoid interacting with law enforcement.  She also testified that this experience has affected her husband.  For example, if he hears anyone drive up to their home, he now looks out the window before answering the door, which was not his habit before the incident.

She further testified that she experiences fear and nightmares.  She testified to having had one nightmare this year.  She is still fearful and intends to move from Lauderdale County as soon as she can find somewhere else to live.  She still fears visiting the Justice Center, even though she visited once in 2011 to support a family member's spouse during a trial and on another occasion to obtain information and records regarding a child custody matter.

She has interacted with Sheriff Sanders after the incarceration on a few occasions.  The first incident occurred when he came to the Rhodeses home.  During that incident, Sheriff Sanders and another officer asked to speak with Raychel,

but she told him she would not speak to him, and that he could speak to her attorney instead.

On cross examination, Raychel Rhodes testified that her daughter was four years old now, but was about two at the time of this incident.  Her daughter Gracie's father was Ashley Childress, Anita Tropster's son, and lived at Anita Tropster's home in January 2010.  Since Gracie's birth, Raychel Rhodes and Ashley Childress had been engaged in a contentious child custody battle regarding Gracie's custody and visitation.[3]

Raychel Rhodes also testified that, on the evening of January 17, 2010, at least two police cars arrived at her home. The cars did not have their sirens activated.  Although she does not recall hearing any sirens on the drive back, she could not say for certain whether the lights were activated.  She was not handcuffed on the drive to the Justice Center, but did not know if Paul Rhodes was handcuffed.

She could not recall the exact number of times that she has visited the Justice Center since the incarceration.  She recalled at least two incidents.  During the first incident, which occurred on April 1, 2011, she spoke to Sheriff Sanders in the hallway outside his office.  She had gone to the Justice Center, accompanied by Simpson, to drop off some records that her attorney had obtained.  She did not enter Sheriff Sanders'

---

[3] Ashley Childress died in December 2011.

office because she wanted to ensure that there were witnesses to any conversation between them. She testified that, after January 2010, Paul Rhodes had always taken Gracie to the Justice Center for the custody exchange.

### 3. Paul Timothy Rhodes

Paul Timothy Rhodes ("Paul Rhodes") testified to the following facts. Paul Rhodes currently lives at 84 Carmack Road in Ripley, Tennessee. He has been married to Raychel Rhodes since May 25, 2008. He has worked as a chemist with Siegel Roberts of Tennessee, an automotive parts company, for the past nineteen years. In January 2010, he earned approximately $50,000.00 per year from his employment there and was allowed approximately fifteen vacation days each year.

Paul Rhodes testified that, on Sunday, January 17, 2010, he and his family left for church at approximately 5:30 p.m. At around 6:00 p.m., he left church to go to the Justice Center and drop off his stepdaughter Gracie with her father, Ashley Childress. Upon leaving the Justice Center, he returned to the church. The family left the church at around 7:45 p.m. After getting home, he left again to drive his eldest daughter to her friend's home and returned at approximately 9:00 p.m. His wife went to sleep at around 10:00 p.m., but he stayed up and continued watching television.

Paul Rhodes testified that he heard a knock at the door sometime between 10:00 p.m. to 10:30 p.m.  He answered the door and saw a number of officers standing outside.  They asked him if he was Paul Rhodes.  When he said yes, they told him he had to go with them.  They asked if there were any guns in the home, and he stated that there were.  They informed him that he was being detained for a burglary investigation, but that they could not tell him where the burglary had occurred.  He told the officers that his wife was asleep in the back of the house.  They told him that he had to wake her or they would.

Paul Rhodes testified that one of the officers, Officer Crowder, asked him to sit down.  At that point, his wife, who had awoken from the noise, walked into the room and started asking the officers questions.  Paul asked the officers if he was being arrested, but they answered that he was only being detained.  When he asked them to explain the difference between being arrested and detained, they simply told him that the difference would be explained when he got to the jail.  He was then handcuffed and placed in a car alone with another officer.  He did not speak with the officer on the way to the Justice Center.

He arrived at the Justice Center at around 11:00 p.m. and was taken to the booking area.  He was asked to fill out some forms and his photo was taken.  Although they allowed him to

make a phone call, the officers told him that he could only tell the person he called where he was; if he divulged any other information, the call would be terminated. He called the mother of the friend with whom his oldest daughter was staying to ask her to take care of his daughter until he and his wife were released. The officers then issued him a jail uniform, a mat, a sheet, a blanket, and a bag of toiletries. They took his clothing, his identification, and his other belongings.[4] (Ex. 8.) He then asked to make a second phone call, which he used to call his workplace to inform them that he could not come in to work the following day.[5] He asked to make a third phone call, but was refused permission to do so.

Paul Rhodes testified that he was then escorted to a holding cell containing a concrete bench and a toilet with a sink. (Ex. 15.) The room had a solid steel door with a flap and a small window, and had lights that remained on for the duration of his stay. He was left unattended for approximately three hours, by which time someone came to ask him how he was doing. He asked that person for a bible, and the person told him that they would try to locate one for him. He had difficulty sleeping on the bench in his room because it was uncomfortable. He did not eat while at the jail.

---

[4] Paul Rhodes also testified that the officers took his cell phone from him when they saw him using it to call a friend who was an attorney.
[5] Because Paul Rhodes was scheduled to work on the Martin Luther King holiday, this incident necessitated taking two vacation days from work.

Paul Rhodes did not speak to an investigator until Tuesday. On Tuesday morning, he met with Simpson and Richardson, who informed him that the investigation was for a break-in at Anita Tropster's house.  They asked him if he was aware of the break in and he told them he was not.  They asked him for his whereabouts on Sunday evening, and he told them what he had done that evening.  After that conversation, they escorted him to a second cell.  He remained there for a few hours until a younger employee visited him to tell him that he was being released.[6]  He was ultimately released at approximately 11:30 a.m.

Paul Rhodes testified that the incident has caused him to lose a sense of security and trust in the justice system. Although he continues to participate in the community, he now locks his doors and prefers to leave town as often as possible to avoid another conflict with law enforcement.  He also felt terrified and humiliated while incarcerated, particularly because the clothing made him feel like part of the general jail population as opposed to merely someone who was the subject of an investigation.  He testified that his wife Raychel is similarly affected with trust issues.  The anxiety has caused both of them to experience difficulty sleeping.  Immediately following the incident, he routinely had nightmares about being

---

[6] Aside from that interaction, the only other contact Paul had with anyone was the conversation with the jail employee who brought him a bible.  No other person spoke to him between Sunday and Tuesday, and he received no information as to why he was being held.

imprisoned and, while the nightmares have largely subsided, they periodically reoccur.

On cross examination, Paul Rhodes testified that he could not recall whether the lights or sirens were activated when the officers arrived at his home. He believes the lights on the car that drove him to the Justice Center may have been activated. He also testified that he was not held with the general prison population, but placed in the court's holding cell. He admitted that he had previously been incarcerated a number of years ago and that he received no adverse employment reaction as a result of this detention. He also testified to visiting a chiropractor for three sessions to treat back pain caused by sleeping on the bench in his cell.

On redirect, Paul Rhodes testified that some other inmates were put into his cell on Tuesday morning. They asked for his food, which he gave to them. After he spoke to the investigators, he was put into another cell. He was initially alone, but another inmate was placed into his new cell for about an hour before Paul was released.

### 4. Sheriff Charles Steven Sanders

Sheriff Charles Steven Sanders ("Sheriff Sanders") testified to the following facts. Sheriff Sanders is the Sheriff of Lauderdale County. Although he directed that the

Rhodeses be picked up for investigation of burglary, he was not at their home or in the jail when they were taken into custody.

Sheriff Sanders testified that it would not be normal protocol for him or his deputies to activate the lights on their vehicle while transporting people to and from the jail. The Rhodeses were not placed into the jail's general population. He testified that the cells have an all-in-one toilet and sink unit for safety purposes. He testified that jail policy dictates that the holding cell in the booking area and court are cleaned before each new inmate is incarcerated. They are usually cleaned by rubbing the walls down and applying disinfectant; however, on occasions when infections like MRSA were introduced in the jail, the entire jail was washed three times per week with special chemicals.

Sheriff Sanders also testified that the increase in law enforcement patrols since the Rhodes' incarceration was caused by a string of incidents that have occurred in the area. He testified that the increased number of patrols was unrelated to the Rhodeses.

Sheriff Sanders testified that, since January 2010, he has spoken with Raychel Rhodes on a number of occasions. The first conversation occurred on January 20, 2010, when Simpson approached him and told him that Raychel Rhodes wanted to speak to him. He went to the Rhodes' home with a female investigator,

but Raychel Rhodes told him to get off her property.  She denied

having wanted to speak with him and told him that he should

speak with her lawyer.  He then left her home.  Their second

interaction occurred when Raychel Rhodes came to the Justice

Center and asked for some records that she claimed to need for

her attorney.  The third incident again occurred at the Justice

Center, when Raychel Rhodes came to drop off some phone records.

Because Sheriff Sanders did not understand why she had come to

his office, he and Raychel Rhodes stood in the hallway outside

his door and she explained her purpose in dropping off the

records.  He did not recall Raychel Rhodes being emotionally

upset or crying during this conversation; instead, she was calm,

rational, and did not seem uncomfortable.

The last incident took place almost six weeks later.

Raychel Rhodes arrived at the Justice Center because she wanted

to take her husband's name off an investigative report.  Sheriff

Sanders called his attorney, even though he had not personally

conversed with her during this fourth encounter.  He did not

recall seeing Raychel Rhodes cry or become emotionally upset

during that conversation.  He testified that she did not seem

afraid of him or reluctant to speak to him during any of these

interactions.

On cross-examination, Sheriff Sanders testified that

Raychel Rhodes was housed in a cell in the booking area while

Paul Rhodes was housed in a holding cell for the court.  Sheriff
Sanders did not personally inspect the cleanliness of these
cells on January 17, 2010.

**III. Conclusions of Law**

The damages provision of 42 U.S.C. § 1983 provides "a
species of tort liability in favor of persons who are deprived
of rights, privileges, or immunities secured to them by the
Constitution."  Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S.
299, 305-06 (1986) (internal quotations omitted).  A plaintiff
who proves a constitutional violation "is entitled to recover
money damages for any injuries he has suffered as a result of
the agents' violation."  Bivens v. Six Unknown Named Agents of
Fed. Bureau of Narcotics, 403 U.S. 388, 397 (1971).  To that
end, a plaintiff in a § 1983 suit "is entitled to compensation
for loss of time, for physical discomfort or inconvenience, and
for any resulting physical illness or injury to health.  Since
the injury is in large part a mental one, the plaintiff is
entitled to damages for mental suffering, humiliation, and the
like."  Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006)
(quoting W. Keeton et al. Prosser and Keeton on the Law of Torts
§ 119 at 888 (5th ed. 1984)).

In actions premised upon an illegal detention, a court may
award two distinct types of damages:  (1) damages for the loss
of liberty, which "redress the denial of free movement and the

violation done to [an individual's] dignity as a result of the unlawful detention, and not the physical and mental injuries arising from the incident," <u>Martinez v. Port Auth. of N.Y.</u>, 2005 WL 2143333 at *19 (S.D.N.Y Sept. 2, 2005); and (2) damages for tangible injury, including "physical harm, embarrassment, and emotional suffering." <u>Id.</u>  In arriving at a damage award, courts have considered the time spent in jail, the mental anguish suffered, any damage to the plaintiff's reputation, and any other relevant criteria.  <u>See, e.g.</u>, <u>Hale v. Fish</u>, 899 F.2d 390, 403 (5th Cir. 1990).  Awards for claims vary widely depending on the circumstances of each case.  <u>See, e.g.</u>, <u>Gardner v. Federated Dept. Stores</u>, 907 F.2d 1348, 1353 (2d Cir. 1990) (remitting $150,000 award for loss of liberty to $50,000 because award was excessive under New York law for detention of twenty hours, but upholding award of $150,000 for pain and suffering because evidence showed that plaintiff suffered from ear aches, lock jaw, and TMJ syndrome); <u>Mason v. City of New York</u>, 949 F. Supp 1068, 1075-76 (S.D.N.Y. 1996) (holding jury award of $100,000 for two hours to be excessive where plaintiff suffered no physical injuries and her detention was not visible to the public).

## 1. Loss of Liberty

At trial, the Court heard evidence indicating that Raychel and Paul Rhodes were taken from their home without explanation,

incarcerated for nearly thirty-six hours in conditions that were objectionably uncomfortable, given little explanation for the cause of their detention, and given no indication of when they would be freed.

Based on the record in this case, the Court concludes that the preponderance of the evidence fairly and reasonably supports an assessment of damages in compensation for Plaintiffs' loss of liberty and AWARDS $72,000.00 to Raychel Rhodes and $72,000.00 to Paul Rhodes.

### 2. Emotional Suffering

At trial, the Court heard evidence indicating that Raychel Rhodes has suffered humiliation and fear as a result of this incident. The Court also heard evidence indicating that Raychel Rhodes has developed a form of mild to moderate PTSD. The Court heard evidence indicating that Paul Rhodes experienced humiliation, fear, and has developed difficulty trusting others and feeling secure. Both have experiences nightmares and difficulty sleeping following these incidents. These symptoms still reoccur intermittently.

Based on the record in this case, the Court concludes that the preponderance of the evidence fairly and reasonably supports an assessment of damages in compensation for Plaintiffs' emotional suffering. The Court therefore AWARDS $80,000.00 in

damages to Raychel Rhdoes and AWARDS $5,000.00 in damages to Paul Rhodes to compensate them for their emotional suffering.

### 3. Vacation Days

Defendants do not contest that Paul Rhodes is entitled to compensation in the amount of $500.00 for the vacation days that he had to use as a result of the incarceration. As a result, the Court AWARDS $500.00 to Paul Rhodes.

## IV. CONCLUSION

For the reasons set forth in this opinion, the Court finds the following sums to reflect reasonably certain assessments of the Plaintiffs' damages: $72,000 for Raychel Rhodes' loss of liberty; $72,000.00 for Paul Rhodes' loss of liberty; $80,000.00 for Raychel Rhodes' emotional injury; $5,000.00 for Paul Rhodes' emotional injury; $500.00 for Paul Rhodes' lost wages. Accordingly, the Court AWARDS $229,500.00 in favor of Plaintiffs.

**SO ORDERED** this 24th day of September, 2012.

s/ Jon P. McCalla
JON P. McCALLA
CHIEF U.S. DISTRICT JUDGE